UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
MITCHELL REISMAN,                         **NOT FOR PRINT OR**
                Petitioner,               **ELECTRONIC PUBLICATION**

        -against-

UNITED STATES OF AMERICA,                 **MEMORANDUM & ORDER**
                Respondent.               12-CV-2913 (KAM)
--------------------------------X
**KIYO A. MATSUMOTO, UNITED STATES DISTRICT JUDGE:**


        Petitioner Mitchell Reisman ("petitioner") was

sentenced to 51 months of incarceration pursuant to a judgment

of conviction imposed on October 12, 2010 in the United States

District Court for the Eastern District of New York.  Alleging

that his federal and constitutional rights were violated due to

the ineffective assistance of his trial counsel and because he

was prevented from testifying at his trial, petitioner seeks

relief pursuant to 28 U.S.C. § 2255 to vacate, set aside, or

correct his sentence.  (ECF No. 1, Motion ("Mot.") filed 6/8/12;

ECF No. 2, Memorandum of Law in Support of Motion to Vacate, Set

Aside, or Correct Sentence dated June 8, 2012 ("Pet. Mem.") at

1, 3-4.)  Petitioner also challenges the evidence presented at

trial and prosecutorial statements made at sentencing.  (Pet.

Mem. at 3-4.)  In a separate letter motion, petitioner

additionally seeks to be removed from "refuse-to-pay" status at

the Federal Correctional Institution in Cumberland, Maryland,

where he is incarcerated.  (ECF No. 12, Pet. Letter dated 9/11/12 ("Pet. 9/11/12 Ltr.") at 2.)

For the reasons set forth below, the petition, in its entirety, and his request to be removed from "refuse-to-pay" status are denied.

**BACKGROUND**

**I.    Petitioner's 2010 Trial**

Petitioner's criminal convictions arise from a jury trial in the district court for the Eastern District of New York, on the charges of Conspiracy to Commit Mail and Wire Fraud, Wire Fraud, and Mail Fraud.  Between 2003 and 2008, petitioner and three co-defendants fraudulently solicited investors and lenders for B.I.M. Mining Corporation ("B.I.M."), a Nevada-based corporation.  *United States v. Kahale*, 09-CR-159 (KAM), 2010 WL 3851987, *2-13 (E.D.N.Y. Sept. 27, 2010). Petitioner and co-defendants falsely represented to investors that B.I.M. was a large corporation with substantial assets, consisting in large part of millions of dollars' worth of precious metals or the rights to such metals.  *Id.* at *2, *4.

The defendants solicited investments or loans from victims by stating, in sum and substance, that B.I.M. would use the money to extract and refine gold from gold mines, to recover other resources, and to repatriate gold from the Philippines, claiming that they had access to World War II deposits.  *Id.* at

2

*2-4.  When a victim loaned or invested money with B.I.M., the defendants issued Gold Delivery Certificates guaranteeing a return on investment in six months or less as collateral for loans or as a proof of investment.  *See id.*  In reality, B.I.M. obtained income only when the defendants induced victims to invest or loan money.  *Id.* at *2-12.  After victims were induced into loaning or investing, the defendants sent fraudulent update letters and e-mails explaining why the aforementioned Gold Delivery Certificates could not be redeemed.  *Id.* at *3-5. Petitioner specifically induced a $100,000 investment by one victim, Vernon Wetmore, by fraudulently representing that B.I.M. was "asset-rich."  *Id.* at *2.  Petitioner was also able to obtain a $50,000 loan from another victim, Dr. Amankwah, in the same manner.  *Id.* at *3-4.

Petitioner was first indicted along with his three co-defendants on March 19, 2009, and a superseding indictment was filed on September 3, 2009.  The superseding indictment charged petitioner and his co-defendants with five counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342, one count of wire fraud in violation of 18 U.S.C §§ 1342 and 1343, and one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349.  The trial began on February 5, 2010, and the government introduced evidence establishing petitioner's role in the fraud, as well as testimony from victims.  The petitioner

3

did not testify, and defense counsel did not introduce witnesses on his behalf.   On February 19, 2010, the jury found petitioner and his co-defendants guilty on all counts.  *Kahale*, 2010 WL 3851987, at *1.

Petitioner subsequently filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, as well as a motion for a new trial under Federal Rule of Criminal Procedure 33, arguing that his trial attorney had rendered ineffective assistance and that the evidence introduced at trial was legally insufficient to warrant his conviction.   On September 27, 2010, this Court denied all of petitioner's post-trial motions in a Memorandum and Order.  *See Kahale*, 2010 WL 3851987.

Prior to sentencing, petitioner filed a letter objecting to certain portions of his presentence report ("PSR"), prepared by the Probation Department.  (*See Kahale*, 2010 WL 3851987; Docket No. 09-CR-159, ECF No. 350, Letter to Judge Matsumoto ("Sentencing Ltr.") dated and filed 8/25/10 at 1-2.) The report contained information regarding his "Independent Schemes," aside from the schemes of conviction, which were alleged to have resulted in an additional $2,000,000 in losses to victims.  PSR ¶¶ 21-23.  Petitioner's letter specifically objected to the inclusion of this information in the PSR. (Sentencing Ltr. at 1-2.)  The government responded to his

4

objections on September 16, 2010, including additional details
and arguing that his "independent schemes" should be factored
into his sentence.  (*See Kahale*, 2010 WL 3851987; Docket No. 09-
CR-159, ECF No. 370, U.S.A. Sentencing Memorandum ("U.S.
Sentencing Mem.") dated 9/16/10 at 7.)  On October 12, 2010,
petitioner appeared for sentencing.  At the hearing, petitioner
and the government both made arguments regarding the
"independent schemes" detailed in the PSR.  This court
acknowledged the parties' arguments and stated from the bench
that it would not consider these allegations in determining
petitioner's sentence.  Petitioner was sentenced to 51 months
imprisonment on the counts of conviction, to be served
concurrently, with credit for time served, and three years'
supervised release.  This court also ordered petitioner and co-
defendants to pay restitution of $1,019,000 and $700 in special
assessments, and held them jointly and severally liable for
forfeiture in the amount of $1,069,000.

**II.   Post-Conviction Proceedings Before the Second Circuit**

        On October 20, 2010, petitioner timely filed a notice
of appeal with the Second Circuit.  Petitioner argued that he
received ineffective assistance from his trial counsel and that
his jury verdict was based on insufficient evidence.  *United
States v. Graham*, 477 F. App'x 818, 824, 826-27 (2d Cir. 2012)

(upholding petitioner's convictions as proper); *cert. denied*, 133 S. Ct. 349 (2012).  Petitioner also argued that his sentence was unreasonable.  The Second Circuit held that petitioner's sentence was reasonable and that his claims regarding the sufficiency of the evidence were unfounded.  *Id.* at 825-26.  The Second Circuit did not reach the merits of petitioner's argument regarding ineffective assistance of counsel, concluding that the record on appeal was "insufficient for us to resolve [the] claim."  *Id.* at 827.

## III.  The Instant Motion

On June 8, 2012, petitioner filed the instant motion pursuant to 28 U.S.C. § 2255.  (*See* Mot.)  The petition was filed within one year of the date on which judgment became final and so is timely.  *See* 28 U.S.C. § 2255(f)(1).

## STANDARD OF REVIEW

A § 2255 motion is made once a prisoner is in custody and sentence has been imposed.  *See* 28 U.S.C. § 2255(a).  Such motions are distinct from habeas petitions.  *See United States v. Hayman*, 342 U.S. 205, 219 (1952).  Motions under this section are appropriate for prisoners to challenge the imposition of a sentence.  *See Adams v. United States*, 372 F.3d 132 (2d Cir. 2004) (holding that petitioner's habeas petition challenging the district court's jurisdiction was barred by section 2255, which

governs motions to vacate, set aside, or correct a sentence).  A prisoner making a § 2255 motion alleges that his sentence was unconstitutional or violated the laws of the United States; that the sentencing court lacked jurisdiction; that the sentence was "in excess of the maximum authorized by law," and/or that the sentence is otherwise subject to collateral attack.  *See* 28 U.S.C § 2255(a).  However, a proceeding under this section cannot be used to review a federal court of appeals decision to dismiss an appeal.  *Rivera v. United States*, 477 F.2d 927 (3d Cir. 1973) (dismissing § 2255 motion because *pro se* petitioner sought to review appellate court decision).  Additionally, in most cases, an issue that has been decided adversely to a defendant on direct appeal cannot be litigated under this section.  *United States v. Natelli*, 553 F.2d 5 (2d Cir. 1977), *cert. denied*, 434 U.S. 819 (1977); *Henkel v. United States*, 367 F. Supp. 1144 (W.D. Pa. 1973), *aff'd without op.*, 503 F.2d 1398 (3d Cir. 1974), *cert. denied*, 420 U.S. 978 (1975); *Stephan v. United States*, 496 F.2d 527 (6th Cir. 1974), *cert. denied*, 423 U.S. 861 (1975); *Jackson v. United States*, 495 F.2d 349 (8th Cir. 1974).

## DISCUSSION

Jurisdiction is not in dispute in this proceeding, and the petitioner filed his motion timely.  Petitioner's claims include (1) the sufficiency of evidence at trial, (2)

ineffective assistance of counsel, (3) the court's consideration of prosecutorial statements at sentencing, and (4) petitioner's request to be removed from "refuse-to-pay" status at the Federal Correctional Institution in Cumberland, Maryland.

## I.   Petitioner's Evidentiary Claim

Under the doctrine of collateral estoppel, a litigant who has had a full and fair opportunity to actually litigate an issue cannot relitigate the same issue.  Issues that have been raised and considered on direct review cannot be relitigated by a motion under § 2255.  *United States v. Jones*, 918 F.2d 9, 10-11 (2d Cir. 1990) (quoting *Barton v. United States*, 791 F.2d 265, 267 (2d Cir. 1986)); *Krutikov v. United States*, 324 F. Supp. 2d 369 (E.D.N.Y. 2004) (holding that because petitioner's sufficiency of evidence claim had been decided on appeal to the Second Circuit, the claim was barred); *Sherbicki v. United States*, 366 F. Supp. 1290 (S.D.N.Y. 1973) (holding that because petitioner's evidentiary claims had been heard on appeal, the claim was barred).

Petitioner raises evidentiary issues regarding his trial, alleging that there was "[i]nsufficient evidence, [sic] presented material falls short of the standard for reasonable doubt."  (Pet. Mem. at 9.) He further alleges that "[a] conviction cannot be based on inferences piled upon inferences." (Pet. Mem. at 10.) Petitioner specifically states that "[to]

prove guilt[], in a conspiracy, the government must show a defendant 'knowingly associated himself with and participated in the criminal venture,'" and cites to *United States v. Burgos*, 94 F. 3d 849, 873 (4th Cir. 1996). (*See* ECF No. 25, Pet. Rep. at 2.) He further states that the government must show that a defendant shares "'in the principals [sic] criminal intent,'" and that the defendant has to have participated in "'at some stage' in the venture, *although participation in every stage is not required.*'" (Pet. Rep. at 2) (emphasis added).

In his post-trial motion and on direct appeal of his conviction to the Second Circuit, petitioner raised the same legal and evidentiary issues that he now raises in the instant petition. The Second Circuit denied his appeal, stating that "[w]e reject Reisman's arguments, as well, for the reasons stated by the District Court. Reisman's argument that he was a victim of his co-defendants is audacious, inasmuch as he kept most of the money he took from the victims of the scheme. . . . [W]e agree with the District Court that there was sufficient evidence from which a rational jury could find both Scarlato and Reisman guilty of the charges beyond a reasonable doubt." *United States v. Graham*, 477 F. App'x 818, 825 (2d Cir. May 1, 2012) (upholding petitioner's convictions as proper); *cert. denied*, 133 S. Ct. 349 (2012).

For the foregoing reasons, petitioner is barred from
re-litigating these evidentiary issues in the instant petition,
as he has already had the opportunity to fully and fairly be
heard.  *United States v. Becker*, 502 F.3d 122, 127 (2d Cir.
2007); *United States v. Pitcher*, 559 F.3d 120, 125 (2d Cir.
2009) (citing *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir.
2001)).

## II.   Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the
Supreme Court articulated a two-prong test in determining if an
attorney has provided ineffective assistance of counsel.  Under
*Strickland*, the inquiry is whether petitioner received
"reasonably effective assistance" of counsel, such that
counsel's actions neither: (1) fell below an objective standard
of reasonableness (the "performance prong"); or (2) caused a
reasonable probability that the result of the trial would have
been different but for counsel's unprofessional conduct (the
"prejudice prong").  *Id.* at 687-96.  This standard is "highly
demanding."  *Kimmelman v. Morrison*, 477 U.S. 365 (1986).

In considering the performance prong, a court must
"indulge a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance."
*Strickland*, 466 U.S. at 689.  Therefore, any "defendant must
overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

Next, under the prejudice prong, the reviewing standard is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. In establishing prejudice, "the question to be asked . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

## Application

### A. *Strickland*'s Performance Prong

Petitioner claims that his trial counsel provided ineffective assistance of counsel for three reasons. First, petitioner alleges that his attorney failed to present the testimony of fifteen witnesses that petitioner states had agreed to testify on his behalf. (Pet. Mem. at 3.) Second, petitioner asserts that his attorney chose not to submit "hundreds of exculpatory evidence documents" (*id.* at 15.), or to use an "8 hour powerpoint presentation" at trial (*id.* at 13). Third,

petitioner claims that his trial counsel did not allow him to take the stand, contravening his constitutional right to testify.  (*Id.* at 6.)  Without specification or explanation, petitioner argues that the witnesses and evidence would have established that he did not work for B.I.M., that he performed due diligence before entering into a business arrangement with B.I.M., and that any defrauding of victims was committed by his co-defendants.  (*Id.* at 4-15.)

### 1.  Counsel's Use of Witnesses

The Second Circuit has repeatedly held that the decision on whether or not to call any witnesses "is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *accord United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002); *Corines v. Superintendent, Otisville Correctional Facility*, 621 F. Supp. 2d. 26, 42 (E.D.N.Y. 2008). A lawyer's decision not to call defense witnesses, "if reasonably made, will not constitute a basis for an ineffective assistance claim."  *Nersesian*, 824 F.2d at 1321.  This is consistent with *Strickland*'s statement that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 488 U.S. at 690).  The decision whether to call "particular

12

witnesses is peculiarly a question of trial strategy which courts will practically never guess." *United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974).

Here, petitioner states fifteen witnesses had agreed to testify in his case, but only names four witnesses that his trial counsel allegedly failed to call: Robert Cleary, Dr. Alan Cohler, Francois Kamalenga, and Ingo Rohloff. (Pet. Mem. at 5-6.) Ms. Jane Murray, petitioner's attorney at trial, submitted a declaration to this court explaining her decisions regarding the use of witnesses at trial. (*See* ECF No. 21, Declaration of Jane Anne Murray ("Murray Decl.") filed 11/13/12 at 5-8.)

In her declaration, Ms. Murray explains that she met with Mr. Cleary on January 27, 2010, at which point Mr. Cleary "confirmed that he knew little or nothing of Mr. Reisman's dealings with investors." (*Id.* at 5.) Additionally, Mr. Cleary stated that he did not wish to testify, and if subpoenaed, would assert his Fifth Amendment rights. (*Id.* at 5.) Ms. Murray therefore made the determination not to call Mr. Cleary as a witness.

Ms. Murray had several telephone conversations with Dr. Alan Cohler, and went so far as to serve him with a subpoena and make arrangements to have him fly to New York to testify. (*Id.* at 6.) However, during a conversation on February 8, 2010, Dr. Cohler stated that he was unaware "of any money Mr. Reisman

received from investors" and denied agreeing to assist with one
of the investments at issue.  (*Id.* at 6.)   Moreover, Ms. Murray
notes that through her communications with Dr. Cohler, it
appeared that his primary motivation in testifying was to
introduce documents at trial evidencing his alleged ownership of
buried assets in the Philippines and have the documents admitted
as court exhibits with an official court stamp, thereby
obtaining "some kind of judicial imprimatur to help market
investment opportunities in his repatriation scheme." (*Id.* at
6.)  Mr. Murray was therefore reluctant to use Dr. Cohler as a
witness, given his eagerness to "advance a personal, and likely
fraudulent, agenda."  (*Id.*)  Ms. Murray further explained that
"to the extent Cohler did not simply taint Reisman by
association, Cohler's testimony would likely portray Mr. Reisman
as an opportunist, a thief, and a liar."  (*Id.*)

        Regarding Francois Kamalenga and Ingo Rohloff, Ms.
Murray states that petitioner advised her that they would be
arriving in New York on February 1, 2010, in order to testify at
trial, but neither man showed up. (*Id.* at 6-7.)  Petitioner
attaches to his petition an unsigned letter purportedly from Mr.
Kamalenga in which Mr. Kamalenga asserts that Ms. Murray advised
him not to fly to New York for trial because he was "not
needed," but Ms. Murray states under oath that she has no
recollection of ever speaking with Mr. Kamalenga.  (Pet. Mem. at

27; Murray Decl. at 6.)  Moreover, Ms. Murray states that her
investigation had led her to believe that calling Mr. Kamalenga
and Mr. Rohloff to the stand would ultimately be
counterproductive, as neither had any personal knowledge of the
trial issues.  (Murray Decl. at 7.)

        Finally, Ms. Murray states that she spoke with Buzz
Potamkin, a possible witness, over the phone, and he confirmed
that he supported one of petitioner's projects, Dinozine, that
was not the subject of any criminal charges.  Moreover, Mr.
Potamkin stated that he had never given petitioner any funds for
the project, and was not aware of petitioner's fundraising
activities for the project.  (*Id.* at 7.)  He further indicated
his reluctance to testify.  (*Id.* at 7-8.)  Ms. Murray made the
determination that, in light of Mr. Potamkin's reluctance to
testify and lack of personal knowledge regarding petitioner's
charged activities, combined with the potential that his
testimony would open an inquiry into petitioner's other business
ventures, she decided that he should not be called to testify as
a witness.  (*Id.* at 7-8.)  This was in part because she
"believed [his testimony] was likely to prejudice the jury
against Mr. Reisman." (*Id.* at 8.)

        In her declaration, Ms. Murray also states that she
made efforts to track down other witnesses, but "to the extent
that these investigations uncovered individuals with any

15

personal knowledge of the transactions at issue, their statements were not helpful to Mr. Reisman." (*Id.* at 8.)

Thus, it is clear that Ms. Murray carefully considered the named witnesses and explored other possible witnesses, and made reasonable determinations "after thorough investigation of law and facts" that their testimony would not have assisted petitioner at trial. *Henry*, 409 F.3d at 63 (quoting *Strickland*, 466 U.S. at 690). Counsel's decision not to call these witnesses thus satisfies the objective standard of reasonableness.

Petitioner cites *Justice v. Hoke*, 90 F.3d 43 (2d Cir. 1996), to support his argument that defense counsel's exclusion of testimony violates his Sixth Amendment right to defense. (Pet. Mem. at 14.) *Justice* is distinguishable for two reasons. First, in *Justice*, testimony was excluded by the presiding judge at trial, not as part of defense counsel's strategic decision-making as in this case. *Justice*, 90 F.3d at 45-47. Second, the witnesses in *Justice* potentially could "create a reasonable doubt that did not otherwise exist," *id.* at 47 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)), whereas the witnesses discussed in the present case could not provide exculpatory evidence. *See United States v. White*, 174 F.3d 290, 296-97(2d. Cir. 1999) (affirming petitioner's conviction and denying petition on the grounds that counsel acted reasonably in not

16

calling a particular witness to the stand and using certain evidence); *Greiner v. Wells*, 417 F.3d 305, 323-25 (2d Cir. 2005) (holding that counsel's decision not to call unfriendly witnesses was not deficient), *cert. denied*, 546 U.S. 1184 (2006).

Accordingly, petitioner's counsel at trial did not act unreasonably in deciding not to call witnesses to the stand.

### 2.   Counsel's Use of Evidence

The Second Circuit has held that decisions relating to the use of evidence are a matter of trial strategy and are waivable by defense counsel on the defendant's behalf, including decisions regarding the "selective introduction of evidence, stipulations, objections, and pre-trial motions." *United States v. Plitman*, 194 F.3d 59, 63-64 (2d Cir. 1999) (holding that defense counsel had validly waived client's Sixth Amendment confrontation right when counsel stipulated to admission of hearsay testimony); *see also White*, 174 F.3d at 296-97 (affirming district court in dismissing *Strickland* ineffective counsel claim); *Greiner*, 417 F.3d at 320-22 (holding that defense counsel's decision not to present evidence of a particular incident was proper).  Here, petitioner baldly claims that Ms. Murray failed to present "hundreds of exculpatory evidence documents," but does not describe or explain how the documents could exculpate him.  (Pet. Mem. at 15.)  He claims

that these documents "*clearly* indicate [he] was not guilty of
the crimes charged." (Pet. Mem. at 4 (emphasis in original).)

In her declaration, Ms. Murray states that she is
"unaware of any documents exculpating Mr. Reisman of the charges
in the indictment." (Murray Decl. at 2.) Specifically, Ms.
Murray states that she did not, after an eleven month
investigation, uncover any documents establishing the legitimacy
of any of petitioner's business ventures. (*Id.*) Ms. Murray
further testifies that most of the documents related to
petitioner's ventures suggested that petitioner was in fact
guilty. (*Id.*) Ms. Murray also states that the documents that
Mr. Reisman has provided to the court to support the instant
motion were also provided to her prior to trial, and that she
did not consider them to be exculpatory. (*Id.* at 3.) She
states that the documents

> contain the hallmarks of so many of the
> documents underlying Mr. Reisman's various
> business ventures: amateurish letterhead;
> typographical and grammatical errors that
> should not be made by the document's
> allegedly sophisticated author; similar
> errors in documents from ostensibly
> unrelated ventures, *suggesting that the same
> individual had authored them*; [and] legal
> documents that did not appear to have been
> drafted by qualified lawyers.

(*Id.* at 3.) (emphasis added). Thus, upon review of the
documents, Ms. Murray "concluded that a jury may find it

objectively unreasonable that a former CPA would continually
vouch – and seek funds – for ventures that were supported by
such documents." (*Id.* at 4.)  As a result, Ms. Murray states
that she chose, from the beginning of petitioner's criminal
case, to exclude evidence of petitioner's other business
ventures at trial. (*Id.* at 4.)  Undercutting petitioner's
arguments is Ms. Murray's declaration that she did this "in
consultation with Mr. Reisman and with his full knowledge."
(*Id.* at 4.)

        Petitioner also contends that he provided to Ms.
Murray documentation of his alleged due diligence into the deal
between B.I.M., Sierra Mining and Weaver Petroleum that proved
the deal's legitimacy, and that Ms. Murray refused to present
these documents at trial. (Pet. Mem. at 4-5.)  In response, Ms.
Murray states that her colleague, Jane Byrialsen, Esq., and an
investigator, Ron Dwyer, extensively researched the alleged
deal. (Murray Decl. at 4.)  After Ms. Byrialsen and Mr. Dwyer
spoke at length with various individuals and business
representatives associated with the alleged deal, who stated in
substance that they viewed the alleged deal as a fraud, Ms.
Murray concluded that the deal for which petitioner claimed to
have conducted due diligence was most likely fraudulent. (*Id.*)
Ms. Murray states that "I also concluded that the documents Mr.
Reisman provided to me . . . would in fact undermine his claim

of due diligence, and would contradict express statements" that petitioner had made to one of the victims to induce the victim's investment in the deal. (*Id.*)

Petitioner's counsel at trial extensively investigated the evidence discussed above and cited by petitioner as exculpatory. Petitioner's counsel determined that the evidence may have in fact incriminated petitioner, and chose not to introduce the documents. In choosing not to introduce this evidence, petitioner's counsel acted in a substantially similar fashion to counsel in prior *Strickland* cases in which the Second Circuit found effective assistance. *See*, *e.g.*, *Plitman*, 194 F.3d at 63-64; *White*, 174 F.3d at 296-97; *Greiner*, 417 F.3d at 320-22. Accordingly, petitioner's counsel at trial acted reasonably and strategically in choosing not to present the evidence raised by petitioner.

### 3. Petitioner's Testimony

Finally, Petitioner alleges that he was not allowed to testify, which violated his constitutional right to testify at trial. (Pet. Mem. at 6.) A criminal defendant has the constitutional right to testify on his or her own behalf, and trial counsel has the duty to inform a defendant of that right. *Rega v. United States*, 263 F.3d 18, 21 (2d Cir. 2001) (citing *Rock v. Arkansas*, 483 U.S. 44, 49-51 (1987)). As such, a defendant who wishes to testify must be permitted to do so, even

if his or her trial counsel concludes that strategic interests
weigh against that choice.  *See Chang v. United States*, 250 F.3d
79, 82-83 (2d Cir. 2001).

     A review of the evidence casts serious doubt on
petitioner's claim that he was not allowed to testify.  Ms.
Murray states in her declaration that she counseled petitioner
regarding testifying and arranged for petitioner to engage in a
mock direct and cross-examination, and at the end of the
session, asked petitioner if he wished to testify.  (Murray
Decl. at 9.)  Petitioner advised Ms. Murray that he did not wish
to do so, and Ms. Murray states that she "communicated this
decision to the Court on the record in [petitioner's] presence
on the following day."  (*Id.*)  Petitioner at no point raised any
objection or interjected when Ms. Murray indicated to the court
that he did not want to testify.  (*Id.*)  Ms. Murray also states
that she and Ms. Byrialsen, co-counsel for petitioner,
repeatedly advised petitioner, both in writing and in person, of
his right to testify and that the decision whether to testify
was his alone.  (Murray Decl. at 8, 10-17.)  Ms. Murray explains
that although she and co-counsel counseled petitioner against
testifying, they "made it clear that [they] could not make the
decision about whether he testified or not" and "assured him
that [they] would respect whatever decision he made."  (*Id.*)  In
addition, Ms. Murray attached to her declaration redacted e-

mails to petitioner in which she stated the foregoing in writing. (*See* ECF No. 21-1, Emails to Reisman, at 10-17 ("Whether or not to testify is your decision. . . . In the end, it's your decision and yours alone.  We will abide by any decision you make.").)

Accordingly, upon review of the evidence, it is clear that petitioner was not prohibited by counsel from testifying at trial, and that he made the decision not to testify.  In addition, Ms. Murray's declaration and the documents submitted by petitioner indicate that Ms. Murray made considered strategic decisions regarding whether to call witnesses to testify and whether to present certain documentary evidence at trial.  When an attorney's strategic decisions are reasonably made, they cannot constitute the basis for an ineffective assistance of counsel claim.  *See Nersesian*, 824 F.2d at 1321.  As such, Ms. Murray's decisions clearly fall within the accepted parameters of reasonable conduct.  *See Strickland*, 466 U.S. at 689.

**B.**   ***Strickland* Probability Prong**

Even assuming, *arguendo*, that petitioner could meet the performance prong of *Strickland*, petitioner's ineffective assistance claim still fails because petitioner has not established that he was prejudiced by showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

22

*Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006) (citing *Strickland*, 466 U.S. at 694).

Here, petitioner fails to explain how either the witnesses or the documentary evidence he references could counter the government's overwhelming evidence at trial, including that he solicited a victim's first $100,000 investment to B.I.M. and kept that entire amount for himself. Petitioner asserts that if defense witnesses had testified, they "would have confirmed" various facts and would have "verified . . . hundreds of documental exculpatory documents." (ECF No. 25, "Reply to Government Response to Petition Filed Under 28 U.S.C. § 2255" ("Pet. Rep.") filed 12/18/12 at 3). However, petitioner fails to show how any of his alleged facts, if proven by witnesses or evidence at trial, could create a reasonable probability that the jury would have returned a verdict of not guilty. Indeed, it is more likely that the evidence petitioner's counsel strategically chose to exclude from trial would have hurt petitioner's defense if introduced, by casting suspicion on the legitimacy of petitioner's business ventures and confusing the jury.

This court and the Second Circuit found there was sufficient evidence at trial from which a rational jury could find beyond a reasonable doubt that petitioner was guilty of the charges. *Graham*, 477 F. App'x at 825 ("Reisman[] . . . kept

23

most of the money he took from the victims of the scheme. His solicitation of $100,000 from Vernon Wetmore is itself sufficient to sustain the jury's verdict. Reisman did not forward any of this investment to B.I.M., instead using it for his own personal expenses, including the purchase of a house."); *Kahale*, 2010 WL 3851987, at *26 ("There was ample evidence for the jury to conclude beyond a reasonable doubt that Reisman possessed the requisite intent to defraud."). Additionally, it does not appear that the excluded evidence could have created a reasonable doubt that petitioner lacked fraudulent intent to defraud his victims, especially considering the countervailing trial testimony of one of the victims, Vernon Wetmore. *See Kahale*, 2010 WL 3851987, at *26. Accordingly, this court does not find that petitioner has shown a "reasonable probability" that any alleged errors by trial counsel can "undermine confidence in the outcome" of his trial. *Strickland*, 466 U.S. at 694. Therefore, plaintiff's § 2255 motion to vacate, set aside, or correct his sentence based on claims of ineffective assistance of counsel is denied.

**III. Prosecutorial Statements**

Petitioner also alleges that false prosecutorial statements at sentencing prejudiced the court against him. The statements were made in the context of two projects petitioner had been engaging in and their viability. (Pet. Mem. at 16.)

24

Petitioner alleges that the prosecution's remarks were "falsely said" and intended to "influence an unjust sentence." (*Id.*) A review of the sentencing proceedings makes it clear that this court did not consider the allegedly false prosecutorial statements in setting petitioner's sentence.

Under Federal Rule of Criminal Procedure 32, a district court preparing to issue a sentence "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B); *United States v. Arevalo*, 628 F.3d 93, 96 (2d Cir. 2010). Additionally, a district court has broad discretion to decide how it will resolve disputed issues at sentencing, provided that the defendant is given a fair opportunity to rebut the government's allegations. *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir. 1992).

This court gave petitioner ample time and opportunity to raise objections to the prosecutorial statements. Petitioner filed objections via letter and made verbal objections during the course of the October 12, 2010 sentencing hearing. At that time, this court ruled in petitioner's favor pursuant to Rule 32(i)(3)(4). (*See* ECF No. 20, Memorandum of Law in Opposition

to Petition ("Gov't Mem.") dated 11/15/12 at 26).  This court
stated on the record that there was insufficient evidence to
determine if petitioner's "independent schemes" raised by the
government were legitimate or fraudulent, and that it would
therefore not rely on the conduct in issuing petitioner's
sentence.  *Id*.  Petitioner's argument that the court was
prejudiced by prosecutorial statements is not grounded in the
factual record and, accordingly, fails.

**III. Refuse-to-Pay Status**

Finally, petitioner requests that the court remove him
from "refuse-to-pay" status at the Federal Correctional
Institution in Cumberland, Maryland.  Petitioner sent a letter
to this court dated September 11, 2012, stating that he was
unable to keep up with the $50 quarterly payments of court-
ordered restitution, and was subsequently put on "refuse-to-pay"
status "as punishment for being out of compliance."  (Pet.
9/11/12 Ltr. at 2.)  Although petitioner does not specifically
explain why he fell behind on his quarterly restitution
payments, he states that a friend deposits money in his account,
which he uses "to stay in touch and to work on my case, buy
stamps, paper etc."  (*Id*.)  According to the government,
petitioner made one restitution payment "[o]n or about December
2011," and has made no payments since, despite having received
more than $1000 from outside sources.  (ECF No. 17, Gov't

26

Memorandum ("Gov't 10/5/12 Mem.") dated 10/5/12 at 1-2.)  On or about March 2012, he was placed on "refuse-to-pay" status for failing to comply with his restitution obligation.  (*Id.* at 2.)  While on refuse-to-pay status, a prisoner's wages are capped at $5.25 per month.  (*Id.*)  During a six-month period from approximately April 2012 to October 2012, petitioner received $1,136.86 from outside sources, but did not make any more restitution payments.  (*Id.*)  In addition, during the first four months of that six-month period, petitioner worked only one hour per month, earning $0.12 per hour.  (*Id.*)  Petitioner made $5.25 per month during the final two months of the six-month period, capped by his refuse-to-pay status.  (*Id.*)

Petitioner argues that the court should take him off refuse-to-pay status (*see* Pet. 9/11/12 Ltr.), and also requests the court to garnish his kitchen wages to satisfy his restitution obligations (*see* ECF No. 19, Pet. Letter regarding Restitution Order ("Pet. 10/11/12 Ltr.") dated 10/11/12 at 1.).  The government opposes both requests, noting that petitioner could pay his restitution obligations by using the funds received from outside sources.  (Gov't 10/5/12 Mem. at 3.)

The court notes, at the outset, that the legal basis for petitioner's request regarding his refuse-to-pay status is unclear.  To the extent that petitioner asks the court to take him off refuse-to-pay status under federal law, the Prison

27

Litigation Reform Act requires all inmates bringing suit to redress any circumstances or occurrences occurring in "any jail, prison, or other correctional facility" to first exhaust their administrative remedies.  42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516 (2002) (holding that exhaustion requirement applies to all prisoners, whether or not claim involves a specific occurrence or general conditions); *Woodford v. Ngo*, 548 U.S. 81, 89-92 (2006) (concluding that the Prison Litigation Reform Act requires "proper exhaustion" as meant in administrative law); *Guida v. Nelson*, 603 F.2d 261, 262 (2d Cir. 1979) (per curiam) (holding that a petitioner must exhaust administrative remedies before pursuing a claim in federal habeas court).

Here, petitioner has failed to exhaust his administrative remedies, despite a clear method of redress.  *See generally* 28 C.F.R. §§ 542.10 - 542.19.[1]  Petitioner is required to exhaust his administrative appeals in this manner before bringing the claim before a court.  *See also Noguera v. Hasty*,

---

[1] Under the Administrative Remedy Program, petitioner must first "present an issue of concern informally to staff," who must attempt to informally resolve the issue before petitioner is allowed to submit a Request for Administrative Remedy.  28 C.F.R. § 542.13.  If informal resolution does not occur, petitioner must then submit the Request pursuant to initial filing requirements.  28 C.F.R. § 542.14.  If the warden denies petitioner's request or petitioner is otherwise dissatisfied, petitioner may then bring an appeal to the "appropriate regional director."  28 C.F.R. § 542.15.  Petitioner is allowed to appeal a rejection by the regional director to the next level.  28 C.F.R. 542.17.

No. 99 Civ. 8786, 2000 WL 1011563, at *12 (S.D.N.Y. July 1, 2000) (holding that plaintiff's efforts were sufficient to exhaust administrative remedies).  In addition, unlike the petitioner in *Odumosu v. Keller*, 205 F.3d 1324 (2d Cir. 2000), who was excused from the exhaustion requirement because administrative remedies were not available for his particular claim, here, an administrative action brought by petitioner would afford him meaningful review and the opportunity to obtain an appropriate remedy.  Notwithstanding petitioner's failure to exhaust, the court further notes that Mr. Reisman has a legal obligation to compensate his victims for the losses they suffered due to his fraudulent acts.

Had petitioner exhausted his administrative appeals and brought suit pursuant to the PLRA, his request to be taken off of refuse-to-pay status would be denied in any event.  The Bureau of Prisons made the determination to place petitioner on refuse-to-pay status because of his failure to obey his legal obligation of restitution.  Courts generally give deference to such administrative decisions by prison officials.  *See, e.g., Block v. Rutherford*, 468 U.S. 576, 591 (1984) (affirming that prison officials be accorded deference in reconciling the conflicting claims of prison security, prison staff welfare, and detainee property rights); *Barber v. Perdue*, No. 11-CV-0127, 2012 WL 5996342, at *9 (N.D.N.Y. Nov. 9, 2012) ("[C]ourts

typically afford considerable deference to decisions made by [the BOP]. It is neither appropriate nor desirable for a court to micromanage that decisionmaking process. . . .").  Thus, the Bureau of Prison's decision would be accorded deference, and in light of the evidence presented by the government, this court would deny petitioner's request on the merits.

As such, petitioner's claim is denied, as he has not exhausted his administrative appeals to the Bureau of Prisons, and the court respectfully defers to the Bureau of Prisons' policy of putting a prisoner on refuse-to-pay status for failing to comply with restitution obligations.

## CONCLUSION

For the foregoing reasons, petitioner's application to vacate his sentence is denied and dismissed with prejudice, and the application to remove petitioner from "refuse-to-pay" status is denied and dismissed.  The Clerk of the Court is respectfully requested to dismiss the petition, enter judgment in favor of respondent, and close this case.  Respondent shall

serve a copy of this Memorandum and Order upon petitioner and file a declaration of service within two days of the date of this Memorandum and Order.

**SO ORDERED.**

Dated:     Brooklyn, New York
           October 24, 2013

                          _____/s/_____
                          **KIYO A. MATSUMOTO**
                          United States District Judge
                          Eastern District of New York